**In the Matter of the WELFARE OF J.K. and K.W., Minor Children.**

**Nos. CX–85–817, CO–85–924 and C2–85–925.**

Court of Appeals of Minnesota.

Sept. 17, 1985.

---

At 307.

John E. Mack, New London, Stephen Torvik, Chippewa Co. Atty., Montevideo, for B.M., father of J.K.

Gregory L. Holmstrom, Granite Falls, for D.W., mother.

Roger L. Swenson, Madison, for K.W., father of K.W., minor child.

Juan A. Alsace, Montevideo, for K.W. and J.K., minor children.

Heard, considered, and decided by WOZNIAK, P.J., and PARKER and LESLIE, JJ.

## OPINION

WOZNIAK, Judge.

Petition was brought by the county to terminate the parental rights of appellants K.W., D.W., and B.M. The trial court ordered that the parental rights of all three appellants be terminated. We affirm as to K.W. and D.W., and reverse as to B.M.

## FACTS

D.W., at age 16, became pregnant with J.K. B.M., age 15, was the true biological father. J.K. was born in January 1980, when D.W. was married to S.K., who was in the U.S. Army. D.W. and S.K. agreed to be married for the purpose of having the army pay for the birth expenses. Shortly after J.K.'s birth, S.K. and D.W. were divorced. B.M. resisted a determination of paternity and asserted that he was not the legal father. He did not support J.K. nor visit her.

In April 1982, D.W. married K.W. The child K.W. was born to this marriage in February 1983. Dr. Carol Lietzau, the doctor in charge of K.W.'s birth, found that there was a possible lack of prenatal care and she called the county welfare department for assistance.

Upon a home visit by a welfare worker, the children were found to be dirty, thin, and ignored by their parents. County social workers began an educational program with the parents, devoting 9 to 25 hours per month, instructing them in health, parenting skills, and financial instruction. Neither parent took the instruction seriously and unhealthy conditions in the home did not change.

In May 1983, a petition for neglect and dependency of children was filed. The children remained with their parents, and a plan of instruction in basic parenting skills, simple money management, and personal health was established.

Notwithstanding that plan, the filthy and dangerous conditions in the household continued. Both K.W. and D.W. failed to take seriously the efforts of county workers, and failed to improve the conditions even when the health of their children was deeply affected. Both children continued to lose weight and were failing in the growth chart. Both children were very dirty and had extensive heat rash. D.W. refused to keep a food history for the children's meals. Dr. Lietzau found large bruises on J.K.'s buttocks. The county, upon learning of the deterioration of the health of the children, moved the court for a finding of neglect and an order for removal. After a full hearing, the order was issued in September 1983.

In November 1983, the court approved a plan to reunite the family. The county welfare department spent 20 to 30 hours per month for six months and involved 16 persons in an attempt to implement the plan and provide intensive counseling and instruction. Both parents failed to develop the ability to provide minimal and basic care for the children, and failed to achieve any of the goals in the plan. K.W. and D.W. continued to minimize the problems and wouldn't admit the need for change. K.W. and D.W. were evicted from their apartment for nonpayment of rent and the dirty condition of the apartment. When K.W. and D.W. took their children out of foster care for home visits, the children were returned dirty, sick, and emotionally drained. K.W. and D.W. separated, and D.W. moved into her mother's home where her mother has taken over family responsibility.

In June 1984, a petition for the termination of the parental rights of K.W., D.W., and B.M. was filed. At this point, B.M. first stepped forward to assert his parental rights. In the meantime he had married, fathered a child, joined the U.S. Air Force, had been assigned to a base in England, and has now returned to the United States. The trial judge found that there was clear and convincing evidence that the parental rights of all three persons should be terminated. K.W., D.W., and B.M. all appeal that decision to this court.

## ISSUES

1. Did the trial court err in terminating the parental rights of appellants?

2. Did the trial court err in admitting the testimony of a psychiatrist where the parties who prepared the reports upon which the psychiatrist based his opinion were not called to testify?

## ANALYSIS

### I.

The degree of proof required to terminate parental rights is clear and convincing evidence that the statutory grounds

for termination have been met. *In re Welfare of Rosenbloom*, 266 N.W.2d 888, 889–90 (Minn.1978); *In re Welfare of White*, 363 N.W.2d 79, 80 (Minn.Ct.App.1985). Findings of fact by the trial court will not be overturned unless clearly erroneous. *In re Welfare of P.J.K.*, 369 N.W.2d 286, 290 (Minn.1985); *In re Welfare of Solomon*, 291 N.W.2d 364, 367 (Minn.1980). However, the reviewing court is to exercise great caution and affirm a termination "only when the evidence clearly mandates such a result in accordance with the statutory grounds." *Welfare of P.J.K.*, 369 N.W.2d at 290 (quoting *Solomon*, 291 N.W.2d at 367).

### A. K.W.

■ The trial court found termination of K.W.'s parental rights proper under Minn. Stat. § 260.221(b)(2), (4), (5) and (7) (1984). There can be little doubt that the trial court's decision was correct. K.W. kept the household in such a dirty condition and fed his child so haphazardly as to put the child's health in jeopardy. He viewed the county aid as an unnecessary and unjustified intrusion into his life, and completely failed to cooperate with the county's plans and instructions. He failed to attend the termination hearing, and has had no contact with his minor child for almost one year. His whereabouts are unknown.

### B. D.W.

■ The trial court found termination of D.W.'s parental rights proper under the same statute and subdivisions as for K.W. As with K.W., the trial court found that as of the time of the hearing, D.W. was not able or willing to assume the responsibilities of the parent/child relationship, and that the problems would continue for a prolonged and indefinite time. The court heard testimony from many county workers and a child psychiatrist as to D.W.'s parenting problems and the unhealthy living conditions. The welfare workers applied plan after plan in working with D.W., but these efforts failed to improve her conduct or attitude. Her great dependence on her husband K.W. has now been transferred to her mother. According to her own testimony, D.W. understood what was expected of her, but was stubborn and refused to cooperate because "I didn't know they'd go this far." She continued in her stubbornness to the point of endangering the health of her children.

D.W. claims, however, that she showed some improvement immediately before the termination hearing and that she should be allowed a reasonable time to continue to improve. The trial court had before it the whole of her negative track record and concluded that there was no current evidence that she would in the future become a fit and suitable parent. The minimal evidence which is pointed out on appeal, which evidence is subject to various interpretations, is simply not enough to show that the trial court was clearly erroneous in finding that D.W.'s poor parenting would continue indefinitely. *See In re Welfare of Maas*, 355 N.W.2d 480 (Minn.Ct.App.1984).

### C. B.M.

The trial court found termination of B.M.'s parental rights proper under Minn. Stat. § 260.221(b), which provides that the juvenile court may terminate parental rights if it finds that one of the following conditions exists:

(1) That the parent has abandoned the child; or

(2) That the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship * *.

Minn.Stat. § 260.221(b)(1) and (2) (1984). The trial court found that B.M. had no contact with J.K. and failed to provide any financial support. In terminating his parental rights, the trial court reasoned that although B.M. may well be able to provide a suitable home for J.K., it was more important to keep the two children together than to allow B.M. to enforce his parental rights (which could result in the separation of the children).

■ In order to terminate parental rights, the trial court must find, in addition to past neglect, that the conditions requir-

ing the termination will continue for a prolonged, indeterminate period. *In re Welfare of Chosa,* 290 N.W.2d 766, 769 (Minn. 1980); *In re Welfare of A.K.K.,* 356 N.W.2d 337, 341 (Minn.Ct.App.1984); *In re Welfare of Udstuen,* 349 N.W.2d 300, 304 (Minn.Ct.App.1984). The issue at the termination hearing is whether a parent is "presently able and willing to assume his responsibilities and not whether he has from time to time in the past been derelict in his duties." *In re Welfare of L.L.N. and B.W.N.,* 372 N.W.2d 60 (Minn.Ct.App. 1985) (quoting *In re Linehan,* 280 N.W.2d 29, 31 (Minn.1979)). Parental rights may not be terminated solely on the ground that it is in the best interests of the child to do so. *In re Welfare of J.W.M.,* 290 N.W.2d 770, 772 (Minn.1980); *In re Welfare of Copus,* 356 N.W.2d 363, 367 (Minn.Ct.App. 1984).

■ Here the trial court made no finding that any parental misconduct by B.M. would continue into the indefinite future. In fact, any such finding would have been clearly erroneous. By the time of the hearing, any prior abandonment of J.K. by B.M. had been terminated by his vigorous defense of his parental rights. There was no evidence of a current refusal by him to accept the duties imposed by the parent and child relationship. B.M. was willing to support his daughter. Other than the separation of the two children, the county had no objection to B.M. exercising his parental rights. The county admits that B.M.'s interest is genuine. Thus, the evidence is not clear and convincing that a statutory ground for termination exists, and the court erred in terminating B.M.'s parental rights.

### II.

Appellants also assert that the trial court erred in admitting the videotaped deposition of a child psychiatrist where the proponent did not also call as witnesses the persons who made the reports upon which the psychiatrist based his opinion. Appellants claim they were denied effective cross-examination where the persons who made the reports were not called to provide an evidentiary foundation for the tape and where appellants did not receive the reports prior to the deposition.

■ Under Minn.R.Evid. 803(6), reports of social workers and psychologists are admissible as business records. *In re Welfare of Brown,* 296 N.W.2d 430, 435 (Minn.1980). It is accepted medical practice to use a team approach for psychological evaluations. The county had the reports prepared in the regular course of business by qualified personnel. Thus, the tape was properly admitted. *Murray v. Antell,* 361 N.W.2d 466, 469 (Minn.Ct.App. 1985). However, where the county knew the deposition was to be used at the hearing, the county should have provided the reports to appellants within a reasonable time before the deposition in order for appellants to be able to question deponent fully.

### DECISION

We affirm the trial court's termination of the parental rights of K.W. and D.W. and reverse the termination of the parental rights of B.M.

Affirmed as to K.W. and D.W.; reversed as to B.M.