*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1539**


In the Matter of the Welfare of the
Child of: C. J. S., Parent.


**Filed March 7, 2016
Affirmed
Bjorkman, Judge**


Hennepin County District Court
File No. 27-JV-15-164

Mary F. Moriarty, Chief Hennepin County Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, Minnesota (for appellant C.J.S.)

Michael O. Freeman, Hennepin County Attorney, Michelle A. Hatcher, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Peter M. Routhier, Bruce Jones, Faegre Baker Daniels LLP, Minneapolis, Minnesota (for guardians ad litem)

DeAundres D. Wilson, Wilson Law Office, P.A., Minneapolis, Minnesota (for respondent G.D.)

Considered and decided by Bjorkman, Presiding Judge; Halbrooks, Judge; and Kalitowski, Judge.\*

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**BJORKMAN**, Judge

Appellant challenges the termination of her parental rights, arguing that there is no statutory basis for termination and termination is not in the best interests of the child. Because clear and convincing evidence shows that reasonable efforts by the county failed to correct the conditions leading to the child's out-of-home placement and termination is in the child's best interests, we affirm.

## FACTS

Appellant C.J.S. is the mother of D.D., born May 2, 2014. G.D. is the adjudicated father of D.D. C.J.S. has a long history of mental-health problems stemming from significant physical and sexual abuse she experienced throughout her childhood. While pregnant with D.D., C.J.S. was admitted to the Hennepin County Medical Center after reporting suicidal and homicidal thoughts. She was placed in a four-point restraint to prevent her from harming herself or her unborn child, and diagnosed with major depressive disorder with psychotic features. She was discharged after three days and prescribed medication to address her mental-health problems. C.J.S. was referred to outpatient treatment, but was discharged prior to D.D.'s birth due to attendance issues.

On June 3, 2014, respondent Hennepin County Human Services and Public Health Department received a report from Headway Emotional Health Services outlining C.J.S.'s mental-health diagnosis and questioning her capacity to parent. D.D. was placed in emergency protective care on June 4, and remains in foster care. On June 9, the department filed a petition alleging that D.D. was in need of protection or services. The district court

adjudicated D.D. as a child in need of protection or services based on C.J.S.'s admission that her mental-health problems negatively affect her ability to parent D.D. The district court ordered the department to create a case plan to address the issues and directed C.J.S. to comply with it. The case plan required C.J.S. to complete a parenting assessment and follow all recommendations, participate in parenting education, successfully complete all services recommended by the Mother/Baby program, and comply with all mental-health programming. And the plan permitted C.J.S. and G.D. to have supervised visits with D.D.

On January 14, 2015, the department filed a petition to terminate the parental rights of C.J.S. and G.D. The termination of parental rights (TPR) petition indicated that C.J.S. was complying with certain aspects of her case plan, but that the department had concerns about her ability to care for D.D. by herself, maintain her mental health, recognize signs of sexual abuse, and protect D.D. from or report abuse by G.D. The concerns over sexual abuse stem from G.D.'s daughter, Ga.D.'s, May 2010 report that G.D. had sexually abused her. The department also asserted that G.D.'s mental-health concerns and alcohol use impacted his ability to parent D.D.

At the TPR admit/deny hearing, both parents denied the petition. C.J.S. requested unsupervised visits with D.D., indicating that she was prepared to separate from G.D., focus on living independently, and show that she could meet D.D.'s needs. The district court stated that if C.J.S. did so, and otherwise progressed with her case plan, it "would be in a position to authorize unsupervised visits." But rather than separate from G.D., C.J.S. married him shortly thereafter.

3

The TPR trial took place over four days between April 7 and July 2, 2015. During the trial, the district court heard testimony concerning C.J.S.'s lack of compliance with her case plan. Mai Vang, a child-protection social worker, testified that C.J.S. successfully completed the Mother/Baby program, which referred her to the Jepson Day Treatment Program. C.J.S. was discharged from the Jepson program due to sporadic attendance and failing to meaningfully engage with the program. At the time of trial, she had started another program that met less frequently, but her attendance continued to be an issue. Sandy Robinson, one of the guardians ad litem (GAL), testified that C.J.S. has not adequately addressed her mental-health issues. She further opined that C.J.S. cannot parent D.D., either independently or in conjunction with G.D. She also expressed concern over the fact that C.J.S. and G.D. had not even progressed to unsupervised visits, despite receiving nearly a year of parenting education and supervised visits. Pat Timpane, the other GAL, concurred with Robinson's opinion that C.J.S. cannot take care of D.D. on her own and that C.J.S.'s mental-health issues are still a concern. Timpane testified that C.J.S.'s mental-health issues had not been treated and that the issues that led to D.D. being placed in foster care had not been addressed. Both GALs and Vang testified that termination of C.J.S.'s parental rights is in D.D.'s best interests.

The district court heard extensive testimony regarding G.D.'s alleged sexual abuse of Ga.D. Ga.D.'s ex-boyfriend, J.G., and her mother, J.W., testified that Ga.D. reported the abuse to them. The district court also reviewed the transcript of the police department's

4

initial interview. Ga.D. recanted the allegations, and G.D. testified that he had been falsely accused.[1]

The GALs expressed concern about these abuse allegations and also over G.D. and C.J.S.'s apparent fixation with changing D.D.'s diaper during supervised visits. G.D., in particular, repeatedly applied ointment on the child's vaginal area, even after her diaper rash was nearly gone. Timpane characterized G.D.'s actions as unnecessary and performed in an inappropriate way. On one occasion, G.D. spread D.D.'s legs so C.J.S. could take a picture of D.D.'s vaginal area. This was reportedly done to document the rash for D.D.'s doctor, but the record indicates that at the time the picture was taken the rash was nearly gone. Both GALs also observed that G.D. was very controlling of C.J.S. and that she deferred to his decisions with respect to D.D.'s care. Robinson further testified that she believed there was a risk that D.D. might be sexually abused. In sum, the GALs were concerned about C.J.S.'s inability or unwillingness to prevent D.D. from possible sexual abuse by G.D.

The district court terminated the parental rights of both C.J.S. and G.D. The district court determined that the department had demonstrated by clear and convincing evidence that both parents failed to comply with their parental duties, they were palpably unfit to parent, that reasonable efforts had failed to correct the conditions that led to D.D.'s out-of-

---

[1] The department also elicited testimony that G.D. has grandiose ideas, including believing that he had been dead once and that he could remember events that occurred when he was as young as six weeks old.

5

home placement, and that D.D. was neglected and in foster care.[2]  The district court expressly found that G.D., C.J.S., and Ga.D. were not credible witnesses, and that Ga.D.'s recantation of the sexual-abuse allegations was suspect.  C.J.S. moved for a new trial, which the district court denied.  C.J.S. appeals.

## DECISION

Parental rights may be terminated "only for grave and weighty reasons."  *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 709 (Minn. App. 2004).  Termination requires clear and convincing evidence that (1) the county has made reasonable efforts to reunite the family, (2) there is a statutory ground for termination, and (3) termination is in the child's best interests.  *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).  On appeal, we review the district court's factual findings "to determine whether they address the statutory criteria for termination and are not clearly erroneous, in light of the clear-and-convincing standard of proof."  *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 665 (Minn. App. 2012) (citation omitted).  We review for abuse of discretion a district court's conclusion that the statutory requirements for termination have been established.  *See In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 900 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

---

[2] The district court made an additional determination of egregious harm with respect to G.D.

**I.** **The district court did not abuse its discretion by concluding that reasonable efforts failed to correct the conditions that led to D.D.'s out-of-home placement.**

A district court may terminate parental rights if clear and convincing evidence shows that reasonable efforts have failed to correct the conditions leading to the child's out-of-home placement. Minn. Stat. § 260C.301, subd. 1(b)(5) (2014). It is presumed that reasonable efforts have failed upon a showing that (1) a child has resided outside the parental home for a cumulative period of 12 months within the preceding 22 months; (2) the court has approved an out-of-home placement plan; (3) the conditions leading to a child's out-of-home placement have not been corrected; and (4) reasonable efforts have been made by the social services agency to rehabilitate and reunite the family. *Id.* It is also presumed that the conditions leading to out-of-home placement have not been corrected upon a showing that a parent has "not substantially complied with the court's orders and a reasonable case plan." *Id.*, subd. 1(b)(5)(iii).

C.J.S. challenges the district court's determination as to the third factor—that the conditions that led to D.D.'s out-of-home placement have not been corrected.[3] She argues that the evidence produced at trial demonstrates that she has substantially complied with her case plan. We are not persuaded. D.D. was adjudicated a child in need of protection or services based on C.J.S.'s admission that her persistent mental-health problems negatively impact her ability to parent. Her case plan required her to participate in individual therapy, parenting education, and couples therapy. The record supports the

---

[3] C.J.S. does not dispute that the department made reasonable efforts to address the issues leading to D.D.'s out-of-home placement.

district court's determination that C.J.S. has not substantially complied with these requirements.

The record amply demonstrates that C.J.S. has not made sufficient progress toward addressing her mental-health concerns. The Mother/Baby Program referred her to the Jepson program, which she did not complete. The discharge summary indicates that she never progressed past the pre-treatment phase because she was resistant to setting goals, did not participate in education offerings, and used the group setting to vent her feelings about "the system." Her resistance to treatment is reflected in her testimony that she does not have a mental-health diagnosis. Vang testified about C.J.S.'s lack of participation and attendance problems with regard to her individual therapy. She acknowledged that C.J.S. had recently started a new program and was increasing her involvement, but testified that this was a very recent development. The June 11 progress report—prepared during the midst of the trial—shows that C.J.S.'s attendance continued to be sporadic. Both GALs opined that C.J.S. had failed to adequately address her mental-health concerns. Robinson testified that one of her main concerns was that the mental-health issues had been "assessed and dropped." Timpane similarly testified that C.J.S.'s mental-health problems are a "huge concern" and that the issues that brought the matter to the department's attention had not been addressed.

The record also supports the district court's determination that the parenting issues that led to D.D.'s out-of-home placement have not been corrected. Robinson testified that the parenting issues had "barely been addressed." Timpane testified that C.J.S. was still unable to pick up on D.D.'s cues, and described C.J.S.'s engagement with D.D. as

8

"scattered." Vang also testified that C.J.S. continued to have problems responding to D.D.'s cues. Multiple witnesses expressed serious concern over C.J.S.'s dependence on G.D. Reports indicate that she was very deferential to G.D. during supervised visits and hesitant to engage with D.D. Robinson also testified that she did not see C.J.S. "iniat[e] any care on her own." Neither GAL believed that C.J.S. had the skills or capacity to parent D.D.

Finally, the evidence shows C.J.S. has not complied with the case-plan requirement that she process the sexual-abuse allegations against G.D. and gain an understanding of the signs of sexual abuse in order to protect D.D. The department provided C.J.S. individual therapy, couple's therapy, and parenting-education classes to address this issue. Despite these resources, C.J.S. refused to acknowledge that G.D. might pose a risk to D.D. C.J.S. testified that she does not believe G.D. poses any risk to D.D. because he did not have an inappropriate relationship with his other daughter. When asked "What if you're wrong" she responded "I'm not wrong." After representing to the district court that she was prepared to separate from G.D. to enable her to have unsupervised visits with D.D., she chose to marry G.D. instead. And C.J.S. remained heavily deferential to G.D.'s parenting decisions with respect to D.D. throughout the entire process. In short, the record supports the district court's determination that C.J.S. failed to meet the goals set forth in her case plan.

On this record, we conclude that C.J.S. did not rebut the statutory presumption that reasonable efforts failed to correct the conditions that led to out-of-home placement. We note that C.J.S. has recently made commendable efforts to increase her participation in

9

individual therapy. But under all of the circumstances, this improvement is insufficient to rebut the statutory presumption. *See In re Welfare of J.K.*, 374 N.W.2d 463, 466 (Minn. App. 1985) (stating that "improvement immediately before the termination hearing" can be insufficient to overcome the whole of a negative track record), *review denied* (Minn. Nov. 25, 1985).[4]

**II.     The district court did not abuse its discretion by determining that termination of C.J.S.'s parental rights is in D.D.'s best interests.**

The three primary factors in a best-interests analysis are "the child's interest in maintaining the parent-child relationship, the parents' interest in maintaining the parent-child relationship, and any competing interest of the child." *In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013); *see also* Minn. R. Juv. Prot. P. 39.05 subd. 3(b)(3). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *K.S.F.*, 823 N.W.2d at 668 (quotations omitted). And, "[f]inality is one factor to be considered in determining a child's best interests." *In re Welfare of Children of B.J.B.*, 747 N.W.2d 605, 610 (Minn. App. 2008). We review a district court's determination that termination is in the best interests of the child for an abuse of discretion. *J.R.B.*, 805 N.W.2d at 905.

C.J.S. argues that the district court abused its discretion by determining that termination is in D.D.'s best interests. We are not persuaded. First, the district court

_____

[4] Because we conclude that reasonable efforts have failed to correct the conditions leading to the child's out-of-home placement, *see* Minn. Stat. § 260C.301, subd. 1(b)(5), we do not consider the remaining statutory termination grounds. *J.R.B.*, 805 N.W.2d at 906 (holding that this court may affirm a termination of parental rights if at least one statutory basis for termination is present and termination is in the child's best interests).

emphasized D.D.'s need for a stable, consistent, and safe environment with a caregiver that could understand and meet her needs. The record amply supports the district court's determination that because C.J.S. is so engrained in her thinking and resistant to addressing her significant mental-health concerns, it is highly unlikely that she will be able to parent D.D. in the foreseeable future. Second, the district court noted, and we agree, that the record demonstrates that C.J.S. loves D.D. and wishes to be reunited with her. But competing concerns regarding C.J.S.'s capacity to care for D.D. outweigh C.J.S.'s preference. Third, D.D.'s need for security and stability supports the district court's best-interests determination. D.D. has spent almost all of her young life in foster care. Her need for finality favors termination of C.J.S.'s parental rights.

Because we discern no error in the district court's determination that C.J.S. did not rebut the presumption that reasonable efforts failed to correct the conditions that led to D.D.'s out-of-home placement and termination is in D.D.'s best interests, we conclude that the district court did not abuse its discretion by terminating C.J.S.'s parental rights.

**Affirmed.**