*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1752**
**A15-1783**

In the Matter of the Welfare of the Children of:
I. M. A. a/k/a I. N. and A. T. N., Parents

**Filed April 18, 2016**
**Affirmed**
**Rodenberg, Judge**

Hennepin County District Court
File No. 27-JV-15-1346
Related File No. 27-JV-14-4797

Mary F. Moriarty, Hennepin County Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, Minnesota (for appellant mother I.M.A.)

Mary F. Moriarty, Hennepin County Public Defender, David W. Merchant, Assistant Public Defender, Minneapolis, Minnesota (for appellant father A.T.N.)

Michael O. Freeman, Hennepin County Attorney, Kacy Wothe, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services and Public Health Department)

Larry E. LaTarte, Rory F. Collins, Bruce Jones, Faegre Baker Daniels LLP, Minneapolis, Minnesota (for respondent guardian ad litem Kim Leipold)

Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

UNPUBLISHED OPINION

**RODENBERG**, Judge

In these consolidated appeals, appellants challenge the termination of their parental rights to their five children. Because a statutory ground for termination was established by clear and convincing evidence and the district court did not err in determining that termination of parental rights is in the children's best interests, we affirm.

## FACTS

Appellant-mother I.M.A., a/k/a I.N., and appellant-father A.T.N. are the parents of P., born in 2008,[1] G., born in 2009, A., born in 2010, T., born in 2012, and R., born in 2014. In February 2012, Hennepin County Human Services and Public Health Department (the department) placed the children in foster care and petitioned the district court to adjudicate the four eldest children in need of protection or services (CHIPS) after mother and T. tested positive for opiates and barbiturates after T.'s birth.

Both parents admitted the allegations of the CHIPS petition. The district court adjudicated the children in need of protection or services, and case plans were approved. In April 2012, P. and G. were placed in father's custody under protective supervision while mother was required to pursue chemical-dependency treatment. A. and T. were placed in father's custody under protective supervision in July 2012 and November 2012, respectively. Father was later arrested for felony burglary, and the district court removed

---

[1] P. was born prior to appellants' marriage. Appellants signed a recognition of parentage for him and A.T.N. has been adjudicated P.'s father.

the children from his care and returned them to foster care in August 2013. P. and G. returned to their parents in January 2014 for a trial home visit, and A. and T. returned to their parents in February 2014.

In June 2014, despite some ongoing instability and difficulty with the parents complying with their case plans, the social worker developed a safety plan with the parents that would permit the CHIPS case to be closed. The safety plan required father to remove the children from mother's care if he suspected her of relapsing. CHIPS jurisdiction ended on June 20, 2014, and the first CHIPS case was effectively closed.[2]

Eleven days later, having discovered mother's drug paraphernalia, indicating to him that she had resumed using drugs, father left the children with mother to report his discovery to human services. While father was making the report, mother fled with the children. She and the children went missing for several weeks during which time they were not in contact with either father or the county. Mother was eventually located in Marshall, Minnesota. It was discovered that she was pregnant and tested positive for benzodiazepines, amphetamine, and barbiturates. Father moved to Marshall to reunite with mother that same month. The children were returned to foster care in July 2014 as a result of all of this.

In September 2014, the children were again adjudicated in need of protection or services, and new case plans were developed for each parent. A third case plan was opened shortly after R. was born addicted to methadone in October 2014. R. was also

---

[2] The social worker testified that she had not completed the paperwork to close the first case before the second one was opened.

adjudicated a child in need of protection and services. R. was permitted to remain with mother under protective supervision. R. was placed in foster care in March 2015 after mother was incarcerated on an outstanding warrant.

On March 16, 2015, the department filed a petition to terminate the parental rights of both parents. The termination of parental rights (TPR) petition indicated that mother was complying with certain aspects of her case plan, but that the department had concerns about her ongoing inability to remain sober, care for the children, and interact appropriately with the children and their foster care providers. The petition also described father's inability to follow through with completing tasks and provide a safe and stable living situation.

After a three-day trial in August 2015, the district court terminated the parental rights of both parents. The district court determined that the county had demonstrated by clear and convincing evidence that termination was in the children's best interests, and that: (1) the parents had failed to satisfy the duties of the parent-child relationship, (2) reasonable efforts by the county failed to correct the conditions leading to the out-of-home placements, and (3) the children were neglected and in foster care. Minn. Stat. § 260C.301, subd. 1(b)(2), (5), (8) (2014). The district court expressly found that the parents were not credible witnesses. Both parents moved for a new trial, which the district court denied. These consolidated appeals followed.

## DECISION

"Parental rights may be terminated only for 'grave and weighty reasons.'" *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 87 (Minn. App. 2012) (citing *In re Welfare of*

4

*Child of E.V.*, 634 N.W.2d 443, 446 (Minn. App. 2001)). In order to terminate parental rights, the petitioner must provide clear and convincing evidence that one of the statutory grounds justifying termination under section 260C.301, subdivision 1(b) of Minnesota Statutes is satisfied. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). "Only one ground must be proven for termination to be ordered." *Id.* On appeal, the district court's order terminating parental rights is reviewed "to determine whether the district court's findings (1) address the statutory criteria and (2) are supported by substantial evidence." *J.K.T.*, 814 N.W.2d at 87; *see also T.A.A.*, 702 N.W.2d at 708. We give deference to the district court's decision to terminate parental rights "but closely inquire[] into the sufficiency of the evidence to determine whether it was clear and convincing." *T.A.A.*, 702 N.W.2d at 708. We review factual findings for clear error and whether a statutory basis for termination exists for an abuse of discretion. *J.K.T.*, 814 N.W.2d at 87. "A finding is clearly erroneous if it is manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole. An abuse of discretion occurs if the district court improperly applied the law." *Id.* (quotation and citations omitted).

## I.     Neglected and in foster care

Minn. Stat. § 260C.301, subd. 1(b)(8), permits a district court to terminate parental rights when "the child is neglected and in foster care." A child is neglected and in foster care if the child (1) "has been placed in foster care by court order"; (2) cannot be returned to his parents due to the parents' "circumstances, condition, or conduct"; and (3) has parents who "failed to make reasonable efforts to adjust their circumstances, condition, or

5

conduct," "despite the availability of needed rehabilitative services." Minn. Stat. § 260C.007, subd. 24 (2014).

To determine whether a child is neglected and in foster care, the district court must consider seven statutory factors:

> (1) the length of time the child has been in foster care;
> (2) the effort the parent has made to adjust circumstances, conduct, or conditions that necessitates the removal of the child to make it in the child's best interest to be returned to the parent's home in the foreseeable future, including the use of rehabilitative services offered to the parent;
> (3) whether the parent has visited the child within the three months preceding the filing of the petition . . . ;
> (4) the maintenance of regular contact or communication with the agency or person temporarily responsible for the child;
> (5) the appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;
> (6) whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time . . . ; and
> (7) the nature of the efforts made by the responsible social services agency to rehabilitate and reunite the family and whether the efforts were reasonable.

Minn. Stat. § 260C.163, subd. 9 (2014). The district court need not address each factor in its order but must "show consideration for them in its findings." *In re Welfare of J.S.*, 470 N.W.2d 697, 704 (Minn. App. 1991), *review denied* (Minn. July 24, 1991).

When the TPR case was tried, P., G., A., and T. were all under eight years old and had been placed in court-ordered foster care for over two years between February 2012 and August 2015. Infant R. had been in foster care for over half of his life at that time.

6

The district court found that the children could not return to the parents' care "now or in the reasonably foreseeable future" because of mother's failure to satisfactorily complete chemical-dependency treatment, her continued use of controlled substances, and father's failure to complete or gain insight from "important services that would have provided him with the necessary skills to adequately care for his children." The district court also found that the parents did not understand why the children were in foster care, had not made adequate efforts to remedy "the circumstances which caused this case to open," and that "no additional services would bring lasting and effective changes" to the parents' ability to care for the children. The district court determined that the county had "provided reasonable and appropriate rehabilitative services and reasonable efforts."

       a.     *Mother*

Mother argues that the district court erred by failing to consider mother's actual conditions at the time of the trial. *See In re Welfare of P.J.K.*, 369 N.W.2d 286, 290 (Minn. 1985) (holding that courts may look to a parent's "actual condition" and not simply "conduct" to determine whether a parent is unfit). Mother claims that she was sober, had secured safe and stable housing, and was seeing an individual therapist to address her mental health concerns.

The record supports the district court's determination that the condition leading to the children's out-of-home placement, primarily related to or arising from mother's chemical dependency, had not changed at the time of trial. Mother underwent 11 chemical-dependency assessments and participated unsuccessfully in 9 different treatment programs during the three-and-one-half years the cases were open. Although

7

mother twice completed primary treatment, she relapsed and failed to complete aftercare as required by her case plan. Mother was not enrolled in any chemical dependency program at the time of trial. Testimony supports the district court's determination that mother admitted relapsing in July 2015 during treatment.[3] Mother repeatedly missed, diluted, or had positive chemical tests, including several during the months just before trial.

Mother's ongoing issues with chemical dependency prevented her from properly parenting the children and led to P., G., A., and T. being diagnosed with multiple mental health disorders. These conditions of the children were worsened by mother's frequent absences due to incarceration or treatment, her inability to ensure a consistent visitation and appointment schedule for herself or the children, and her inability to obtain safe and suitable housing for the children until the eve of trial. Mother has also disappeared with the children while using chemicals and was dishonest with the social worker. The district court did not err in determining that this statutory basis for terminating mother's parental rights was proven. *See In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 903-04 (Minn. App. 2011) (holding that the district court did not err in terminating the parental rights of a mother whose children had spent two years in court-ordered foster care and who had "only haphazardly exercised visitation," failed to address her chemical dependency, and had not secured adequate housing for the children), *review denied*

---

[3] Although the record contains contrary evidence on this point, including mother's testimony, the district court expressly found both parents' testimony not credible, and we defer to the district court's credibility determinations. *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 96 (Minn. App. 2008).

(Minn. Jan. 6, 2012). The district court's findings reflect careful consideration of the factors identified in Minn. Stat. § 260C.163, subd. 9, and the record supports those findings.

> b. *Father*

Father argues that, because he sufficiently completed his case plan, clear and convincing evidence does not support termination under this ground. Although case-plan compliance is important, "[a] parent's substantial compliance with a case plan may not be enough to avoid termination of parental rights when the record contains clear and convincing evidence supporting termination." *J.K.T.*, 814 N.W.2d at 89; *see also In re Welfare of Maas*, 355 N.W.2d 480, 483 (Minn. App. 1984) (affirming that mother's substantial compliance with court-ordered parenting sessions, psychological treatment, and sobriety were insufficient to avoid termination given her negative track record and poor prognosis for long-term improvement). "The critical issue is not whether the parent formally complied with the case plan, but rather whether the parent is presently able to assume the responsibilities of caring for the child." *J.K.T.*, 814 N.W.2d at 89 (citing *In re Welfare of J.L.L.*, 396 N.W.2d 647, 651 (Minn. App. 1986)).

The record contains substantial evidence that, despite father's general compliance with the case plan, he continues to exhibit an inability to properly care for the children given their substantial need for "living in an environment with a high degree of predictability, structure, and consistent, nurturing care." Father admitted that he was unsure if he could care for all five of the children on his own and that he had difficulty

managing more than one child at once alone. This difficulty was particularly evident when father interacted with the three youngest children.

Father was frequently late for or missed parenting-skills appointments, special events, and visitations with the children, despite promises to appear. At least one of the children was described as "show[ing] little reaction to the changes of one or the other parent being present or not present for a session," indicating that the child "may be accustomed to this inconsistency from [the] parents and the lack of reaction may be reflective of [the child's] level of expectation." In April 2015, foster parents reported that two of the children had extremely negative responses to visits with their parents, and visits with those children were suspended because of "the children's emotional needs for stability and less confusion."

Both parents missed important assessments for P. and R. Additionally, father lost custody of his nonjoint daughter (not involved in this case) after failing to attend multiple court hearings without explanation. Father inconsistently attended his individual therapy sessions; he missed 8 out of 18 scheduled appointments between January 7 and May 20, 2015 and did not schedule any appointments between May 20 and July 24, 2015. This critical period of time followed the filing of the TPR petition and was before trial. Inconsistent attendance during this time period was appropriately considered by the district court as significant evidence of whether the children were neglected and in foster care. Despite noting father's improvement during his parenting sessions, the parenting skills worker testified that she did not believe either parent could meet the children's strong needs for stability, structure, and consistent nurturing care at the time of trial.

Father evidenced a frequent inability to make decisions without mother's input. Father admitted that he was not always able to tell if mother was using nonprescribed controlled substances, and the record supports the district court's determination that father places more importance on his relationship with mother than he places on the safety of the children. The district court did not find credible father's assurances that he would leave mother if she relapsed again. And the district court found that father does not appreciate the risk that mother's continued drug use poses to the children's safety and wellbeing. We defer to the district court's credibility determinations. *D.F.*, 752 N.W.2d at 96.

Significantly, father told mother in recorded jail calls that he would "just separate from [mother] in a fake way" to obtain custody of the kids and that he was "trying to f*****g blow smoke up the therapist's a** like [he's] a f*****g good person . . . [and that he'll] just do whatever [the social services providers] say" in order to convince the county to close the case.

Both parties exhibited dishonest behavior with the social worker by lying about mother having had surgery to prevent further pregnancies, mother's repeated forgeries, and father's statements that he would just pretend to listen to providers, follow the plan, and leave mother if necessary until the case plan was closed. Although the parents had obtained housing at the time of trial and father was then employed, the district court's determination that "they have had extraordinary instability for the majority of this case, and father has struggled to maintain past employment opportunities" is well-supported by the record. *See In re Welfare of J.K.*, 374 N.W.2d 463, 466 (Minn. App. 1985) (stating

11

that "improvement immediately before the termination hearing" can be insufficient to overcome the whole of a negative track record), *review denied* (Minn. Nov. 25, 1985).

Father also argues that his having reported mother's relapse in July 2014 demonstrates that he should retain his parental rights even if mother's rights are terminated. But father failed to follow the safety plan and left the children in mother's care while reporting her relapse to the social worker at a time when he knew that she was again using drugs. Father has not shown that he is capable of protecting the children from mother's substance abuse by removing the children from mother's care upon her relapse, and the district court did not find credible father's assurances that he would do so in the future. Here again, we defer to the district court's credibility determinations.

Father argues that R. should be treated differently because R. does not have the mental health diagnoses that afflict the older children and his placement did not exceed the permanency guidelines. Neither parent raised this issue in their motions for a new trial before the district court. We generally consider "only those issues that the record shows were presented and considered by the trial court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (quotation omitted).

Regardless, and even separately considering R., the district court did not abuse its discretion in terminating father's rights. R. had already been placed out-of-home for the majority of his young life. The social worker testified that *all* of the children need consistency and predictability that the parents have not been able to provide during the cases. The social worker described the circumstances at the time of the trial as largely "the same" as those at the beginning of the cases. Without father distancing himself from

12

mother, R. will be exposed to the same sort of conditions that created the older children's mental health concerns and will be exposed to the same instability that the older children have had. The district court found, and the record supports, that father will not prioritize R.'s safety and security over father's relationship with mother. The district court credited the testimony of the guardian ad litem that, in the future, father would not know about mother's chemical use, follow the safety plan, or be able to manage the children's therapy appointments, individualized education programs, and R.'s early childhood activities.

The district court properly considered the statutory factors in its order, and therefore did not abuse its discretion by determining that the statutory ground for termination under subdivision 1(b)(8) was proven here. *See J.S.*, 470 N.W.2d at 704.

On this record, the district court did not err in concluding that clear and convincing evidence demonstrates that the children were neglected and in foster care as a result of mother's failure to address her ongoing chemical-dependency issues. Likewise, the record contains clear and convincing evidence that father was incapable of understanding the children's needs for consistency and stability or the severe impact that mother's chemical-dependency issues had on their five children. Because the record supports the district court's determination under section 260C.301, subdivision 1(b)(8), we may affirm the termination order concerning mother without reviewing the district court's reliance on other statutory grounds for termination. *See In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008) (stating that at least one statutory ground for termination must be supported by clear and convincing evidence).

13

## II.     Best interests

Appellants dispute the district court's finding that termination of their parental rights is in the best interests of the children. "Even when statutory grounds for termination are met, the district court must separately find that termination is in the child's best interests." *J.K.T.*, 814 N.W.2d at 92. "Because the best-interests analysis involves credibility determinations and is generally not susceptible to an appellate court's global review of the record, we give considerable deference to the district court's findings." *Id.* (quotation omitted). When deciding what is in the best interests of a child, the district court considers the interests of the child in preserving a relationship with his natural parent, as well as the interests of the parent and any competing interests. *Id.* "Competing interests include health considerations, a stable environment, and the child's preference." *Id.* In any analysis, however, the best interests of the child are paramount. Minn. Stat. § 260C.301, subd. 7 (2014). "[T]he best interests of a child are not served by delay that precludes the establishment of parental bonds with the child by either the natural parent or adoptive parents within the foreseeable future." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996).

Mother claims that termination is not in the best interests of the children because she has a close relationship with the children, is beginning to address her chemical-heath issues, has pursued individual therapy for her mental health concerns, and the children will likely continue to be separated among different placements. Father argues that termination is not in the best interests of the children because he has a close relationship with the children, had made demonstrated progress on his case plan, and, by the time of

trial, had obtained employment and signed a year-long lease for an apartment. Father also argues that the district court erred in failing to separately consider R.'s best interests because R. does not have the same needs as the older children, and that the county did not make reasonable efforts to reunite father with R.

The district court made specific and extensive findings balancing the interests of appellants and of the children. While both appellants clearly love their children, testimony of a bond with the children is not enough to establish that it is in the children's best interests for appellants to retain custody of the children. *See In re Welfare of A.V.*, 593 N.W.2d 720, 722 (Minn. App. 1999) (terminating the parental rights of a father, despite the father's bond with the children, because father "[could] not be trusted with the care of [his] children"). Despite the love the parents have for their children, the record evidence dramatically demonstrates mother's ongoing chemical dependency and mental health concerns; father's ongoing failure to ensure the children's safety from mother's substance abuse; a lack of stable safe and suitable housing (until potentially on the eve of trial); both parents' inability to manage time and stress appropriately; the parents' frequent and unexplained absences from assessments, appointments, and visits with the children; the length of time the children had been in out-of-home placements; and the significant improvement of the children's mental health while in foster care. Substantial evidence supports the district court's findings concerning the children's need for a consistent, predictable routine in a safe and suitable environment, which appellants have demonstrated they are unable to provide now or in the foreseeable future. Under these

15

circumstances, and with due deference to the district court's findings, we see no error in the best-interests finding.

**Affirmed.**