*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1280**

In the Matter of the Welfare of the Child of: L. R. and J. B., Parents

**Filed February 13, 2017
Affirmed
Peterson, Judge**

Swift County District Court
File No. 76-JV-16-153

Danielle H. Olson, Swift County Attorney, Allison T. Whalen, Benson, Minnesota (for respondent Swift County Human Services)

John E. Mack, Mack & Daby P.A., New London, Minnesota (for appellant L.R.)

Jan M. Nordmeyer, Nelson and Kuhn, Ltd., Glenwood, Minnesota (for respondent J.B.)

Penny Johnson, Willmar, Minnesota (guardian ad litem)

Considered and decided by Peterson, Presiding Judge; Bjorkman, Judge; and Jesson, Judge.

**U N P U B L I S H E D   O P I N I O N**

PETERSON, Judge

In this appeal challenging the termination of her parental rights, appellant argues that the district court erred by concluding that (1) she failed to correct the conditions leading to the out-of-home placement of the child and (2) termination is in in the child's best interests. We affirm.

**FACTS**

Appellant L.R. is the mother and J.B. is the father of L.J.B., who was born in 2015.[1] Their older child, S.J.B., who was born in 2013, was removed from their home on December 15, 2014, by Kandiyohi County Human Services after medical providers discovered that S.J.B. had at least four healing bone fractures. One of the fractures was severe enough to require surgery. Kandiyohi County was unable to identify the cause of S.J.B.'s injuries. Kandiyohi County provided family-reunification services, including psychological testing and therapy, counseling, stress- and anger-management classes, supervised visitation, and other supportive services.

On November 2, 2015, Swift County social worker Emily Rademacher made a home visit to the parents, who had moved to Swift County. Respondent Swift County Human Services had been notified about L.J.B.'s birth because of the egregious harm to S.J.B. Rademacher discovered unexplained "yellowing and bruising" on three-week old L.J.B.'s right thigh. The child also had severe diaper rash. Neither parent could explain the bruise, which was unusual for a three-week-old infant and, according to Rademacher, could not be explained by diapering technique. L.R. later said that she might have "tapped" the baby's thigh on a stair rail. Rademacher asked the parents to take the child to the doctor. Dr. Beverly Ricker testified that she noted a small, non-concerning bruise on the child that she thought could have occurred during diapering.

---

[1]J.B. has not appealed from the termination of his parental rights.

2

Swift County was concerned because of S.J.B.'s injuries and decided to remove the child from the home under a 72-hour law-enforcement welfare hold on November 2, 2015. Swift County filed an emergency child-in-need-of-protection-or-services (CHIPS) petition on November 4. On January 27, 2016, the child was adjudicated CHIPS. Meanwhile, the parties' parental rights to S.J.B. were terminated by the Kandiyohi County district court on February 10, 2016, when they admitted to the petition on the second day of the termination-of-parental-rights (TPR) trial. On March 25, 2016, Swift County filed a petition to terminate the parents' parental rights to L.J.B.

Before filing the petition, Swift County offered a number of services to the parents, including: (1) a parenting coach and parenting education, (2) transportation, (3) anger- and stress-management counseling, (4) chemical-use assessments, (5) parental-capacity assessments, (6) psychological assessments, (7) psychiatric assessments, (8) medication management, (9) a psychosexual evaluation, (10) cognitive behavioral therapy, (11) dialectical behavior therapy, (12) individual therapy, (13) budgeting education, and (14) supervised visitation. Kandiyohi County provided the same services, which overlapped in time with those offered by Swift County. Kandiyohi County strongly recommended to Swift County that all of the services provided to the family in the S.J.B. case be continued.

There were three major areas of concern about L.R. First, L.R. "suffers from anxiety, depression, . . . adjustment disorder, and borderline personality disorder." J.B. and L.R.'s mother and sister all testified that they have concerns about L.R.'s mental health. Despite her mental-health issues, L.R. delayed making appointments for a psychiatric and

3

a psychological assessment, and the appointments she made were for after the termination trial. L.R. participated in cognitive behavior therapy during the CHIPS action in Kandiyohi County but failed to continue the therapy as required by the Swift County court order. She was ordered to engage in dialectical behavior therapy but failed to make an appointment despite the Swift County order and remained on a waiting list. L.R. participated in individual therapy as part of the Kandiyohi County case but was terminated for failing to appear for scheduled appointments, and she failed to schedule any appointments despite the Swift County order to do so. L.R. failed to schedule anger-management and stress-management counseling despite orders in both counties. L.R. was ordered to have a psychosexual evaluation but failed to appear for it; because of time constraints, this requirement was removed in the review order filed in April 2016. L.R. tested negative for chemical abuse and was compliant with prescribed medications.

The second area of concern about L.R. was her lack of stable housing and employment. L.R. lived with J.B. until they ended their relationship in January 2016. She moved in with her father but left after a disagreement with her stepmother. She moved back with J.B. for a short time. She met a new boyfriend and lived with his mother for a month or two. In May 2016, not long before the termination hearing, she moved into an apartment with her new boyfriend. The living conditions in each of these residences were questionable. J.B.'s cat posed a potential danger to the child, and the parenting coach noted that J.B.'s home was dirty. Another social worker identified several safety concerns at L.R.'s father's residence, which remained uncorrected. L.R. refused to permit Swift County to make home visits to her boyfriend's mother's home or to her new apartment.

4

The Kandiyohi County social worker testified that stable housing was an ongoing problem up through the termination trial involving S.J.B. in February 2016 and that she was unable to determine the parties' living situation much of the time. Shortly before the S.J.B. termination trial, the parents' electricity was shut off and they had trouble paying for housing. This period overlaps the Swift County CHIPS proceeding.

L.R. was directed to search for employment. She has had "sporadic employment." She was fired from one job in October 2015. She got a job at a poultry-processing plant but quit after two weeks when she was injured in a car accident in February 2016. When a Kandiyohi County social worker questioned L.R. about her job in February 2016, L.R. told her that she was still working at the job she had been fired from in October 2015. Shortly before the termination hearing, L.R. found a new job working part time as a store cashier. She testified that it could be full time "if I want to."

Finally, L.R.'s ability to safely parent was questioned. The district court found that L.R. seemed to be unable to "read nonverbal cues from her children." L.R. was "oblivious" to S.J.B.'s broken bones, despite the fact that the child probably "exhibited pain symptoms." L.R. also did not notice pain symptoms in L.J.B., who had severe diaper rash. The parenting coach "occasionally needed to direct [L.R.] in the care of her child." L.R. testified that the parent coaching she received was "ineffective." The guardian ad litem testified that L.R. has not proved "herself to be in a stable position that she needs to be [in] to be a safe and reliable and nurturing [parent] and able to provide for her daughter."

The district court was also concerned about L.R.'s "inappropriate romantic relationships and exposing her child to dangers relating to these relationships." The parents

5

fought both verbally and physically in front of their children. L.R. had a sexting relationship with an older man, who made sexually suggestive remarks about S.J.B. That relationship continued even after these remarks. Shortly after breaking up with J.B., L.R. entered into a new relationship, but was reluctant to permit Swift County to interview her new boyfriend.

The district court filed an order on July 20, 2016, and judgment was entered on July 21, 2016. The district court held that Swift County did not prove one of the alleged grounds for termination – that L.R. neglected her parental duties under Minn. Stat. § 260C.301, subd. 1(b)(2) (2016). But the district court concluded that Swift County proved that L.R. was palpably unfit under Minn. Stat. § 260C.301, subd. 1(b)(4) (2016), and that L.R. failed to correct the conditions that led to the child's placement outside the home, despite reasonable efforts by Swift County. Minn. Stat. § 260C.301, subd. 1(b)(5) (2016). The district court also found that termination of L.R.'s parental rights was in L.J.B.'s best interests. The district court terminated both L.R.'s and J.B.'s parental rights to L.J.B. This appeal followed.

**D E C I S I O N**

**I.**

A person's parental rights to a child may be terminated based on one of nine grounds set forth in Minn. Stat. § 260C.301, subd. 1(b) (2016). An appellate court reviews the district court's findings in a termination case for clear error, *In re Children of T.R.*, 750 N.W.2d 656, 660 (Minn. 2008), and reviews its decision to terminate for an abuse of discretion. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 136 (Minn. 2014). A petition

6

to terminate parental rights may allege more than one basis for termination, and a district court may terminate parental rights when at least one of the statutory grounds for termination is supported by clear and convincing evidence and the court determines that termination is in the child's best interests. *Id.* at 137.

The district court concluded that L.R. failed to correct the conditions that led to out-of-home placement. Minn. Stat. § 260C.301, subd. 1(b)(5) provides that a parent's rights may be terminated when

> following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement. It is presumed that reasonable efforts under this clause have failed upon a showing that:
>
> (i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. In the case of a child under age eight at the time the petition was filed alleging the child to be in need of protection or services, the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the out-of-home placement plan;
>
> (ii) the court has approved the out-of-home placement plan required under section 260C.212 and filed with the court under section 260C.178;
>
> (iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to a child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and

7

(iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

The district court concluded that the child had resided out of the home for more than six months; L.R. had not complied with the out-of-home placement plan; and L.R. failed to rebut the presumption that reasonable efforts have failed to correct the conditions leading to L.J.B.'s placement. The district court cited L.R.'s late and sporadic attempts to comply with the case plan and noted that both Swift County and Kandiyohi County had provided services that were "reasonably designed to correct the issues presented by the parents."

L.R. argues that the condition that led to out-of-home placement was a bruise on L.J.B.'s thigh and the bruise had resolved. Therefore, she contends, the condition that led to out-of-home placement has been corrected. But it is clear from both the emergency order and the CHIPS order that the court viewed the bruising on the child's thigh in the context of the earlier severe physical abuse of S.J.B. The district court made the following findings after the CHIPS hearing: (1) the parents were the subject of a CHIPS petition in Kandiyohi County based on serious physical abuse of S.J.B.; (2) the parents were participating in a case plan in Kandiyohi County; (3) a Swift County social worker noticed bruising on the child's thigh; (4) although one physician was not concerned, two physicians, including an abuse specialist, did not think the bruising could be attributed to diaper changing, opined that a three-week-old infant usually does not acquire bruises, and noted the serious abuse history involving S.J.B.; (5) both parents had a history of mental-health issues; (6) L.R. had a history of engaging in difficult romantic relationships; (7) the parties had "a tumultuous relationship that has resulted in past physical altercations";

8

(8) the guardian ad litem, who was also appointed in Kandiyohi County and, therefore, had worked with the parties for several months, testified that the parents appeared to lack the ability to safely parent the children without supervision; and (9) both parents acknowledged that the services the counties were providing were helpful. This demonstrates that the out-of-home placement was based on the circumstances in which the bruise occurred, and not just the bruise itself.

In its dispositional order in the CHIPS matter, the district court ordered L.R. to (1) complete an anger-management program; (2) complete a stress-management program; (3) complete a chemical assessment; (4) complete psychological, psychiatric, and psychosexual assessments, and follow the recommendations; (5) attend cognitive behavioral therapy and dialectical behavior therapy and follow all recommendations; (6) complete parenting-education classes; and (7) abstain from chemical use.

In the termination judgment, the district court found that L.R. had completed a chemical assessment and did not need further services, attended parenting classes, was compliant with her medication, consistently visited the child and was prepared for the visits, and worked on budgeting issues. But the district court also found that L.R. (1) had not completed the anger-management or stress-management programs; (2) failed to schedule the psychiatric, psychological, and psychosexual assessments until it was impossible to complete them before trial; (3) failed to participate in cognitive behavioral therapy; (4) failed to schedule dialectical behavior therapy until it was too late to participate before trial, and her intake appointment occurred just before trial; (5) did not participate in individual therapy after she was suspended for not attending appointments; (6) was

9

sporadically employed; and (7) exhibited frustration during the budgeting sessions. These findings are supported by record evidence and are not clearly erroneous. Although there is evidence that L.R. made some progress, the evidence does not demonstrate that the district court's findings that L.R. failed to correct conditions were clearly erroneous. *See In re Welfare of J.K.*, 374 N.W.2d 463, 466 (Minn. App. 1985) (stating that minimal evidence of improvement was not enough to show that district court was clearly erroneous in concluding that appellant's poor parenting would continue indefinitely), *review denied* (Minn. Nov. 25, 1985).

L.R. does not dispute these findings. Instead, she argues that the child had not been out of the home for more than six months at the time the termination petition was filed, and that the petition did not allege that the child had been out of the home for more than six months, that a plan had been approved, or that Swift County had made reasonable efforts to provide services. Therefore, she argues, the petition was defective because it did not give her notice of this statutory ground for termination, a due-process argument. This court reviews whether a parent's due-process rights have been violated in a termination proceeding as a question of law, subject to de novo review. *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 97 (Minn. App. 2008).

"Due-process guarantees preclude the termination of parental rights based on a statutory ground that was not included in a petition to terminate parental rights." *Id.* at 98. The termination petition alleged failure to correct conditions despite reasonable efforts as one of the grounds for termination. This statutory basis for termination includes a presumption that reasonable efforts to correct conditions have failed if an infant has been

10

out of the home for more than six months, there is a court-approved plan, the parent has not complied with the plan, and the social-services agency has made reasonable efforts to reunify the family. Minn. Stat. § 260C.301, subd. 1(b)(5)(i-iv). But "[t]his clause does not prohibit the termination of parental rights . . . prior to six months [for a child under the age of eight] after a child has been placed out of the home." *Id.* Thus, Swift County may plead the statutory ground of failure-to-correct-conditions without relying on the presumption. By the time of trial, however, the conditions of the presumption were met. L.R. received notice in the termination petition that the relevant statutory ground was one of the alleged bases for termination; due process did not require Swift County to plead the means by which this statutory ground would be proved. Swift County was obligated to provide notice of the statutory ground, which it did; it was not obligated to plead all of the factual bases it would rely on in proving the statutory ground for termination.

The district court's findings are not clearly erroneous and support its conclusion that L.R. failed to correct the conditions leading to the out-of-home-placement despite Swift County's reasonable efforts.

## II.

L.R. argues that the district court's best-interests findings are inadequate to support termination. We review the district court's best-interests determination for an abuse of discretion. *D.F.*, 752 N.W.2d at 95. "An order terminating parental rights must explain the district court's rationale for concluding why the termination is in the best interests of the children." *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). The district court summarized as follows:

The child is nine months old and is not of sufficient age to express an opinion regarding the preservation of her parent-child relationships. There exist[], however, competing and superseding interests. The child's safety and wellbeing are of the utmost importance to this court. As previously stated, [L.R. and J.B.] were unable to maintain a safe living environment for the child, which resulted in her injury and removal. [Kandiyohi County] and [Swift County] provided numerous services to the parents to resolve the safety and stability concerns permeating the parents' living situations, but the safety and stability of the parents' homes remains a significant concern. The child's need for stability and security outweighs the preferences of the parents. The child will be safest and most stable out of the homes of [L.R. and J.B.]. It is in the best interest of the child that the parents' parental rights be terminated.

In a termination proceeding, "the best interests of the child must be the paramount consideration[.] . . . Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7 (2016). A court analyzes the child's best interests by considering the child's interest in preserving the parent-child relationship, the parent's interest in preserving the parent-child relationship, and any other competing factors. Minn. R. Juv. Prot. P. 39.05, subd. 3(3). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012) (quotation omitted).

The district court analyzed the child's best interests by reviewing all the evidence submitted. The district court emphasized the need for a safe environment and stability in the child's life and concluded that L.R. had been unable to demonstrate that she could provide a safe and stable environment for the child. The district court was particularly concerned about safety in light of S.J.B.'s serious injury. This court generally defers to the

district court's decision about the child's best interests because the district court is in the best position to make credibility decisions. *Tanghe*, 672 N.W.2d at 625-26.

L.R. argues that the district court should have employed the best-interests factors set forth in Minn. Stat. § 518.17 (2016) (setting forth factors to consider in making a custody decision in a marital-dissolution matter). But those factors are used for determining the best interests of a child when the custody or parenting-time rights of two fit parents are involved. In a termination matter, the question of best interests arises after a district court has determined that a parent is not fit because one of the statutory grounds for termination exists. *See, e.g., In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013) ("Once a district court determines that at least one of the statutory grounds for termination has been met, it must also find that termination is in the child's best interests."). This court has rejected the use of the section 518.17 best-interest factors in proceedings that do not involve custody in dissolution matters. *See In re Paternity of B.J.H.*, 573 N.W.2d 99, 102 (Minn. App. 1998) (concluding that best-interest factors of section 518.17 were "not intended to be dispositive in resolving conflicting paternity presumptions"); *see also In re Welfare of Child of A.H.*, 879 N.W.2d 1, 5 (Minn. App. 2016) (concluding that district court did not err by applying best-interests standards of juvenile-protection statute rather than those of the parenting-time statute, Minn. Stat. § 518.175, when juvenile-protection statute made no reference to parenting-time standards). The district court did not err by refusing to consider the best-interest factors set forth in Minn. Stat. § 518.17.

**Affirmed.**

13