*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A16-0767**

In the Matter of the Welfare of the
Child of: J. L. H. and A. T. S., Parents.

**Filed November 21, 2016**
**Affirmed**
**Jesson, Judge**

Carver County District Court
File No. 10-JV-15-510

Jody Winters, Glencoe, Minnesota (for appellant-mother)

Mark Metz, Carver County Attorney, Martha Mattheis, Assistant County Attorney, Chaska, Minnesota (for respondent Carver County Health and Human Services)

Joan Miller, Shakopee, Minnesota (for respondent-father)

Charles Jones, Chaska, Minnesota (guardian ad litem)

Considered and decided by Ross, Presiding Judge; Cleary, Chief Judge; and Jesson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JESSON**, Judge

Appellant J.L.H. argues that the record does not support the district court's order terminating her parental rights based on three different grounds. Because clear and convincing evidence supports the district court's termination of her parental rights on the

statutory ground that she failed to satisfy the duties of the parent-child relationship and the child's best interests support termination, we affirm.

**FACTS**

K.C.S., the child who is the subject of these proceedings, was born to J.L.H. in March 2007. In April 2009, an altercation occurred between the child's parents. Responding police and a social worker found their home to be filthy, with animal and possibly human feces on the floor, and so cluttered it was difficult to get into any bedroom. The child had on only a shirt and had a piece of her own feces stuck to her foot. J.L.H. appeared to be under the influence of some substance, as she had slow speech and was not finishing sentences. J.L.H. had previously overdosed on medication, and a social worker believed that she was overmedicated. J.L.H. also swore and was argumentative, blaming the child's father for the situation.

Carver County Health and Human Services removed the child from the home and placed the child in relative foster care. The county filed a child-in-need-of protection-or-services (CHIPS) petition, and a determination of maltreatment was made. In September 2009, the parents regained custody of the child.

The CHIPS file was closed in the district court in June 2010, but the county continued offering services to the parents, including assigning a case worker; establishing a crisis response when J.L.H. was overmedicated; coordinating her treatment goals; prescribing medication; and providing individual therapy. A guardian ad litem also continued working on the case. In August 2010, the county investigated a report of dangerous conditions in J.L.H.'s home. Responding police found a sixteen-year-old male,

a friend of J.L.H.'s teenaged son, passed out in an oversized fish tank; illegal drugs in a location accessible to the three-year-old child; a number of empty pill bottles; rotten, moldy food; and an insect infestation. J.L.H. returned home appearing intoxicated and wished to drive with the child in the car, but she was prevented from doing so. A maltreatment determination was made against her.

In June 2011, the county investigated a report that the child was often seen outside the home unsupervised and alone. A social worker and a police officer interviewed J.L.H. about the allegations. J.L.H.'s speech was barely understandable, she stated that people were stealing her drugs, and her home was in disarray. Officials were concerned that she was abusing prescription medication or other drugs and placing the child at risk. The county concluded that J.L.H. had maltreated the child.

The parents divorced in 2011, and the district court granted J.L.H. custody, with the child's father granted supervised visitation. In March 2012, J.L.H.'s mother went to check on her daughter and found her asleep on the couch. The child had been unable to wake J.L.H. J.L.H. was taken to a detox facility, and a social worker believed that she was overmedicated and addicted to morphine. Another maltreatment determination was made. The county also initiated a civil commitment proceeding, which resulted in J.L.H.'s civil commitment as mentally ill and chemically dependent. The father obtained custody of the child on the belief that he could then best care for the child. In fall 2013, J.L.H. sought a change of custody in family court, and the parents agreed to joint legal and physical custody, with the child alternating weeks at her parents' homes.

In spring 2014, the county received a number of child-protection reports, including that J.L.H. had been seen inebriated at the child's school, that the child had been sexually abused by her father, and that the child showed attention-seeking behaviors at school, including some with possible sexual themes. J.L.H. reported the suspected sexual abuse to several mandated reporters, urging them to contact social services. In March 2014, the county opened a child-protection investigation to determine whether the child had been sexually abused or exposed to pornographic materials, but did not find maltreatment. The county attempted a safety networking meeting, but the meeting was contentious, and it appeared that the child's behavior resulted from anxiety caused by her parents' conflicts. After the filing of a new CHIPS petition in May 2014, the district court granted temporary custody to the child's father and parenting time to J.L.H.[1]

In September 2014, the county received information that J.L.H. had made a recording of the child alleging that her father had sexually abused her. At a child-protection interview, the child made no disclosure of sexual abuse, and a nurse who was present believed from the recorded interview that J.L.H.'s questioning of the child was unreliably suggestive. Criminal charges were never filed against the child's father. The county instead determined that J.L.H. had committed neglect and emotional harm by asking the

---

[1] Although not material to our analysis, we note that the record is unclear as to whether the child's father was granted temporary sole legal and physical custody, or only temporary sole physical custody. *Compare* Minn. Stat. § 518.003, subd 3 (2014) (in dissolution actions, defining custody, including "legal custody" and "physical custody and residence") *with* Minn. Stat. § 260C.007, subd. 22 (2014) (in child-protection actions, defining "legal custody," but not physical custody).

child multiple times about alleged sexual abuse, using leading questions, and that her behavior had a substantial negative impact on the child.

In October 2014, police executed a search warrant at J.L.H.'s home. The home smelled of cat urine and feces, with piles of dirty clothes, dishes piled in the sink, moldy dishes in the dishwasher, and moldy food in the refrigerator. Police found a large number of pill bottles, as well as crushed pills and foil that had been burned and likely used to smoke the pills. Beginning in October 2014, the county required supervised parenting-time between J.L.H. and the child.

In November 2014, both parents participated in a parenting assessment by Dr. George Petrangelo. He opined that J.L.H. exaggerated to such an extreme that he had trouble making an accurate diagnostic profile. According to him, J.L.H. had mental health issues including borderline personality disorder, opioid dependency/polysubstance abuse, PTSD, generalized anxiety disorder, and major depressive disorder and paranoid schizotypical avoidant personality traits. Dr. Petrangelo believed that J.L.H. had a bond with the child, but that she was preoccupied with her mental illness and consumed by anger, which affected her ability to focus effectively on parenting.

In 2014, the county also retained Dr. Susan Phipps-Yonas, a psychologist, as a case consultant. She testified that the child, who has special needs, requires a parent who provides consistent parenting, sets appropriate boundaries, and follows through with assisting professionals. Phipps-Yonas described J.L.H. as a non-responsive parent and stated that no progress was being made in the supervised visits, and there were no indications that J.L.H. would ever be able to parent the child or have unsupervised visits.

5

She believed that J.L.H.'s holding out hope to the child of reunification exposed the child to "ambiguous loss," which occurs when a parent is physically but not psychologically present, and which may be more damaging than a child losing a parent and then moving on.

J.L.H.'s therapist, Connie Gibson, did not see symptoms of psychosis in J.L.H. and indicated that J.L.H. had made changes, but she continued to have difficulty managing her emotions. Gibson also testified that she believed that dialectical-behavioral therapy (DBT), a skills-based therapy that focuses on issues of borderline personality disorder, would be appropriate for J.L.H., but that J.L.H. was unable to complete the DBT modules in 2014 due to a lack of attendance, and Gibson had no evidence that J.L.H. would have better attendance in the future.

In May 2015, the county filed a petition to transfer legal and physical custody of the child to the father. In June 2015, police responded to J.L.H.'s home after she reported that officers were executing a search warrant. She pointed to a chair in which she said an officer was sitting, but there was nobody in the chair; police determined that no search warrant existed. They believed J.L.H. was under the influence of drugs and transported her to the hospital, where she was placed on a 72-hour hold. Drug testing for other than her prescribed medication, Suboxone, was negative.[2] A psychiatric nurse practitioner diagnosed her with borderline PTSD, major depressive disorder, generalized anxiety

---

[2] Suboxone is a pain medication that is also used for opiate dependency.

disorder, and posttraumatic stress disorder. J.L.H. declined a referral to the county for mental health services.

In August 2015, J.L.H.'s supervised parenting time was temporarily suspended after she lost emotional control during a parenting-time session and berated a parenting-time supervisor and left angry messages for her. In October, J.L.H. was accompanied to a court hearing by a suspended attorney who was known to law enforcement to be involved in the disappearance of at least two Minnesota children during child-custody cases. The county changed the parenting time to a more secure location, and professionals involved in the case expressed concern for the child's safety going forward.

In October, the county withdrew the petition to transfer legal custody, and in November, it filed a petition to terminate appellant's parental rights.[3] J.L.H. entered a denial to the petition. In January 2016, a pain-management clinic discharged her for violating her pain-management opioid agreement by attempting to crush her pill and take it in a different form than prescribed.

The district court held a fourteen-day trial in January and February 2016 and issued an order terminating J.L.H.'s parental rights. The district court found that the county had made reasonable efforts to reunify the child with J.L.H. It found that the county had met its burden to prove by clear and convincing evidence that three grounds existed for terminating J.L.H.'s parental rights: (1) she had failed to satisfy the duties of the parent-

---

[3] The child's guardian ad litem testified that, although he was concerned when the suspended attorney came to court with J.L.H., that attorney's presence was not determinative in the county's decision to recommend terminating parental rights.

child relationship; (2) she is a palpably unfit parent; and (3) the county's reasonable efforts had failed to correct the conditions leading to the child's out-of-home placement. *See* Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5) (2014). It also found that it is in the child's best interests to terminate parental rights. *See id*., subd. 7.[4] J.L.H. appeals.

## D E C I S I O N

A district court may terminate parental rights if clear and convincing evidence establishes at least one statutory ground for termination and if termination is in the child's best interests. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). On appeal, this court reviews the district court's findings of fact for clear error. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660–61 (Minn. 2008) (quotation omitted). But this court reviews the ultimate determination that the findings fit the statutory criteria for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

The district court terminated J.L.H.'s parental rights on three grounds. But we need only address the sufficiency of one of those grounds to terminate parental rights. *See R.W.*, 678 N.W.2d at 55 (stating that only one ground must be proved for the district court to order termination).

---

[4] The district court found that, historically, the child's father had abused chemicals and been violent and uncooperative, but that he had taken advantage of services and made significant and lasting changes in himself and his ability to parent the child, so that he was currently a more appropriate parent than J.L.H., who had failed to make changes over time.

***I.***     ***Clear and convincing evidence supports the district court's termination of parental rights on the ground that J.L.H. substantially neglected to comply with the duties of the parent-child relationship.***

The district court determined that J.L.H. neglected the duties of the parent-child relationship. *See* Minn. Stat. § 260C.301, subd. 1(b)(2). A district court may terminate parental rights under this section if it finds that "the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed . . . by the parent and child relationship." *Id*. Those duties include providing food, clothing and shelter, and education, as well as additional "care and control necessary for the child's physical, mental, or emotional health and development." *Id*. To grant a petition for termination on this ground, the district court must find that, at the time of termination, the parent is not "presently able and willing to assume [her] responsibilities" and that the parent's neglect of these duties "will continue for a prolonged, indeterminate period." *In re Welfare of J.K.*, 374 N.W.2d 463, 466–67 (Minn. App. 1985) (quotation omitted), *review denied* (Minn. Nov. 25, 1985).

J.L.H. argues that she has proved that she is able to provide food and other care necessary for the child's physical and emotional health. She argues that before 2014, the county did not deem any issues significant enough to recommend a transfer of legal custody or a termination of her parental rights. But J.L.H. had at least four determinations of neglect or maltreatment issued against her when the child was in her care. Further, when addressing the issue of termination of parental rights, the district court's primary focus is on "the projected permanency of the parent's inability to care for his or her child." *In re Welfare of S.Z.*, 547 N.W.2d at 893 (Minn. 1996) (quotation omitted). Therefore, the

9

district court was required to examine more recent conditions and J.L.H.'s ability going forward to care for the child.

Cindy Finch, a child protection worker assigned to the case in 2014, testified that she was concerned for the child's reunification in a safe environment with J.L.H. because she had been misusing Suboxone by smoking it, which could cause sleepiness and inattentiveness to a child. Police responding to J.L.H.'s home in 2015 observed that she appeared to be hallucinating. Charles Jones, the child's guardian ad litem, testified that when the child lived primarily with J.L.H., issues arose relating to a filthy home, neglect, and school attendance and homework. Jones also believed that her behavior at times reflected an overuse of medication, that she had an impaired ability to properly supervise or meet the child's needs, and that she had been unable to sustain any changes that she had made. He testified that, although J.L.H. loves the child, he was concerned about her ability to parent in the foreseeable future.

J.L.H. argues that she has been attempting to address the issue of her own mental health, and she notes that termination of parental rights cannot be based solely on a parent's mental illness. *S.Z.*, 547 N.W.2d at 892. But the district court may terminate parental rights if a parent's mental illness is likely to lead to a child's harm. *T.R.*, 750 N.W.2d at 661-62. Petrangelo reported that J.L.H. exaggerated her symptoms, was preoccupied with her own illness, and had an agenda to blame the child's father, which made her struggle to focus on the child's needs. J.L.H. argues that her therapist, Connie Gibson, ruled out some of Petrangelo's mental-health diagnoses. But although Gibson testified that she did not see symptoms of psychosis in J.L.H., she noted that J.L.H. continued to have difficulty

10

managing her emotions and that she had been unable or unwilling to engage in recommended dialectical behavioral therapy.

J.L.H. argues that the report of Deena McMahon, a therapist who conducted an attachment assessment, conflicted with the reports of other professionals about the strength of her attachment to the child. The district court has the responsibility to weigh witness credibility, *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992), and the district court's giving more weight to certain testimony does not mean that its findings lack evidentiary support and must be reversed. *Id.* Rather, we defer to the district court's credibility determinations. *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 90 (Minn. App. 2012). McMahon testified that she observed J.L.H. acting in a way inconsistent with the child's needs by failing to set limits or provide emotional or physical structure or limit setting for the child. She believed that J.L.H. had a poor prognosis for healthy attachment based on J.L.H.'s perception of the situation, which amounted to paranoia, considering only her own needs and blaming other people. This assessment was also consistent with the opinion of Phipps-Yonas, who reported that J.L.H. had made psychologically harmful statements to the child, which were anxiety-producing and confusing. Phipps-Yonas stated that J.L.H. was a non-responsive parent, that she was not making progress in the supervised visits, and that she did not display indications that she would ever be able to parent the child or have unsupervised visits.

Based on this record, we conclude that clear and convincing evidence supports the district court's determination that J.L.H. neglected the duties of the parent-child relationship, and the district court did not abuse its discretion by terminating J.L.H.'s rights

on that ground under section 260C.301, subdivision 1(b)(2). *See In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 663-68 (Minn. App. 2012) (affirming termination of parental rights of mother who, despite education, instruction, and other services, could not adequately parent her children).

Because at least one statutory ground for terminating parental rights is supported by clear and convincing evidence, we need not address the district court's additional bases for terminating J.L.H.'s parental rights. We note, however, that much of the same evidence that supports termination under section 260C.301, subdivision 1(b)(2), also supports termination under section 260C.301, subdivision 1(b)(5), the failure of reasonable efforts to correct the conditions leading to the out-of-home placement. J.L.H. does not argue that the county failed to provide reasonable efforts to reunify her with the child. Rather, she argues that following those efforts, the conditions that led to the out-of-home placement have been corrected. As discussed above, however, J.L.H.'s participation in county-provided services has not significantly improved her ability to parent, and the conditions that led to the out-of-home placement still exist.

## II. *The record supports the district court's determination that termination is in the child's best interests.*

Even if a statutory ground for termination exists, before terminating parental rights, the district court must still find that termination of parental rights is in the best interests of the child. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). In determining the child's best interests, the district court must analyze: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-

child relationship; and (3) any competing interests of the child. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(5); *R.T.B.*, 492 N.W.2d at 4. "Competing interests include such things as a stable environment, health considerations and the child's preferences." *R.T.B.*, 492 N.W.2d at 4. "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. We apply an abuse-of-discretion standard of review to a district court's finding that termination is in a child's best interests. *J.R.B.*, 805 N.W.2d at 905; *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 95 (Minn. App. 2008).

J.L.H. argues that the district court's order does not support its best-interests determination and does not reflect that it explained the child's interests or adequately weighed competing interests. An order terminating parental rights must explain the court's rationale for concluding why termination is in the children's best interests. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). But we have held that a district court's findings may provide adequate support for termination even when those findings are not greatly detailed. *See In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004).

The district court found that, despite the love that J.L.H. has for the child and her best intentions, she does not have the capacity to act in the child's best interests, and that termination of J.L.H.'s parental rights is the only "reasonable option in order to protect [the child] from further harm and mental injury." The district court found that the child "needs safety, security, and stability," she "has been exposed to trauma her entire life," and she "cannot continue to heal from that trauma without permanent removal from her mother and knowing that her father's home is her forever home." Although the district court could

have made more detailed findings expressly linking its best-interests determination to the record, its order contains sufficient findings reflecting consideration of that factor. And the record amply supports the district court's finding that the child's competing interest in stability favors termination of J.L.H.'s parental rights. J.L.H. has expressed a sincere wish to parent the child, but the child has special needs, and an environment with more structure and support benefits her short-term and long-term needs of stability. Further, because the child has been exposed to adverse experiences throughout her childhood, it is very important that she finally has a permanent home. The district court did not abuse its discretion by determining that the best interests of the child would be served by terminating J.L.H.'s parental rights.

**Affirmed.**

14